**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| MAKAYLA MARTINY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>APPLE AMERICAN GROUP LLC and APPLE AMERICAN GROUP II, LLC,<br><br>Defendants. | Case No. 1:26-CV-02053<br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Makayla Martiny ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendants Apple American Group LLC and Apple American Group II, LLC (collectively "Defendants"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard the personally identifiable information ("PII") and personal health information ("PHI") of their current and former employees (including Plaintiff's), including names, Social Security numbers, government ID numbers, financial account codes, credit and debit account info, health records, and biometric information.[1]

2. Defendants are restaurant franchise operators that own and operate Applebee's Neighborhood Grill and Bar restaurants throughout the United States.

---

[1] The use of "PII/PHI" encompasses either PII, PHI, or both PII and PHI.

3. Between approximately April 8, 2026, and April 9, 2026, an unauthorized third party gained access to Defendants' network systems and obtained files containing the PII/PHI of Defendants' current and former employees, including Plaintiff (the "Data Breach").

4. Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect their current and former employees' PII/PHI from unauthorized access and disclosure.

5. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Makayla Martiny***

7. Plaintiff Makayla Martiny is a citizen of Georgia.

8. Plaintiff is a former employee of Defendants. As a condition of providing employment to Plaintiff, Defendants required Plaintiff to provide them with her PII/PHI.

9. Plaintiff believed Defendants had implemented and maintained reasonable security and practices to protect her PII/PHI. With this belief in mind, Plaintiff provided her PII/PHI to Defendants in connection with obtaining employment from Defendants.

10. At all relevant times Defendants stored and maintained Plaintiff's PII on their network systems, including the systems accessed in the Data Breach.

11. Had Plaintiff known that Defendants do not adequately protect the PII in their possession, she would not have obtained employment from Defendants or agreed to entrust them with her PII/PHI.

12. Plaintiff received a notice letter from Defendants notifying her that her PII was affected in the Data Breach.

13. As a direct result of the Data Breach, Plaintiff has experienced an increase in the number of spam calls that she receives.

14. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantially increased and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII; deprivation of the value of her PII; and lost time mitigating the effects of the Data Breach.

***Defendant Apple American Group LLC***

15. Defendant Apple American Group LLC is a Tennessee limited liability company with its principal place of business at 6200 Oak Tree Blvd, Suite 250, Independence, OH 44131.

***Defendant Apple American Group II, LLC***

16. Defendant Apple American Group II, LLC is a Tennessee limited liability company with its principal place of business at 6200 Oak Tree Blvd, Suite 250, Independence, OH 44131.

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

18. This Court has general personal jurisdiction over Defendants because their principal places of business are in this State, they regularly conduct business in this State, and they contract to supply goods or services in this State.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendants' principal places of business are in this District and a significant amount of the events leading to Plaintiff's causes of action occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

20. Defendants are the largest owner-operators of Applebee's franchises in the world, operating over 460 locations in 26 states.[2] Upon information and belief, Defendants are both subsidiaries of Flynn Group LP ("Flynn Group").

21. Upon information and belief, Flynn Group provides employees and applicants with a Workplace Privacy Notice (the "Privacy Policy").[3] The Privacy Policy "explains what types of personal information may be collected from and about employees including contractors and temporary workers, job applicants, and candidates, and how that personal information is used and

---

[2] *See Flynn Applebee's*, Flynn, https://flynn.com/applebees/ (last accessed Aug. 25, 2026).

[3] *Flynn Group Workplace Privacy Notice*, Flynn (Sept. 6, 2024), https://flynn.com/wp-content/uploads/2024/09/Employee-Privacy-Notice-9.6.24.pdf.

shared by Flynn Group and/or its subsidiaries," including Apple American Group LLC and, upon information and belief, Apple American Group II, LLC.[4]

22. In the Privacy Policy, Defendants represent "Flynn recognizes the confidential nature of the personal information in its care and is accountable for the compliance of itself and its directors, officers, management, employees, representatives, and agents in protecting this personal information."[5]

23. The Privacy Policy lists the ways Defendants may use and share the PII/PHI it collects, including to "manage all aspects of the employment relationship."[6] None of the permitted uses include a data breach.[7]

24. In the regular course of its business, Defendants collect and maintain the PII/PHI of their current and former employees. Defendants required Plaintiff and Class members to provide them with their PII/PHI as a condition of providing them with employment.

25. Plaintiff and Class members are current or former employees of Defendants who entrusted Defendants with their PII/PHI.

***The Data Breach***

26. Between approximately April 8, 2026, and April 9, 2026, an unauthorized third party gained access to Defendants' network systems, which Defendants discovered on or about April 9, 2026.[8] After an investigation, Defendants determined that files were accessed and acquired

---

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] Apple American Group LLC & Apple American Group II, LLC, *Notice of Data Event*, Cal. Att'y Gen. (Aug. 18, 2026), https://oag.ca.gov/system/files/Apple%20American%20Group%20LLC%20and%20Apple%20American%20Group%20II%2C%20LLC%20-%20Notice%20of%20Data

in the Data Breach and that the compromised data included PII/PHI, including that of Plaintiff and Class members. The PII/PHI affected in the Data Breach included at least "Social Security Numbers, Government ID Numbers, Financial Account Codes, Credit and Debit Account Info, Health Records, Biometric Information."[9]

27. Defendants recognize the risk of serious harm Plaintiff and Class members now face as a result of the Data Breach. For example, the data breach notice Defendants sent to those affected stated that it was "providing guidance about free resources that are available to assist with monitoring relevant accounts, credit reports, and how to place a fraud alert or security freeze on one's credit file."[10]

28. Despite learning about the Data Breach on or about April 9, 2026, Defendants did not begin notifying affected individuals until on or about August 18, 2026, over four months later.

29. Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendants Knew that Criminals Target PII/PHI***

30. At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected and stored was a target for malicious actors. Despite such knowledge, Defendants

---

%20Event%20-%20CA_0.pdf (last accessed Aug. 25, 2026).

[9] *Security Breach Notices*, Off. of the Vt. Att'y Gen., https://ago.vermont.gov/categories/security-breach-notices (last accessed Aug. 25, 2026)

[10] *Notice of Data Event*, *supra* note 8.

failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from cyberattacks that they should have anticipated and guarded against.

31. It is well known among companies that store sensitive personally identifiable information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[11]

32. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[12] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[13]

33. PII/PHI is a valuable property right.[14] The value of PII/PHI as a commodity is measurable.[15] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory

---

[11] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, Bus. Insider (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[12] *Data Breach Outlook*, Kroll, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed Aug. 25, 2026).

[13] *See id*.

[14] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[15] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, Medscape (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

frameworks."[16] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[17] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

34. Criminals piece together bits and pieces of compromised PII/PHI for profit by creating "Fullz" packages. "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more.

35. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII/PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

36. The development of "Fullz" packages means that the stolen PII/PHI from the Data Breach can easily be used to link and identify it to Plaintiff's and Class members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII/PHI that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

---

[16] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLibrary (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[17] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, Interactive Advert. Bureau (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

37. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to criminals.

38. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

39. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[18] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[19]

40. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[20] According to a report released by the Federal Bureau of

---

[18] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HealthTech Mag. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[19] *Id.*

[20] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC Mag. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[21]

41. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[22] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[23]

42. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[24]

43. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[21] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[22] Steager, *supra* note 18.

[23] *Id.*

[24] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Info. Sys. Rsch. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

44. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[25] [26]

45. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[27]

46. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[28]

---

[25] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC Consumer Info., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Aug. 25, 2026).

[26] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[27] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, Experian (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[28] Identity Theft Resource Center, *2025 Consumer Impact Report*, Identity Theft Res. Ctr. (2025), https://www.idtheftcenter.org/publication/itrc-2025-consumer-impact-report/ (last accessed Aug. 25, 2026).

47. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[29] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[30] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care." [31] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[32]

48. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

---

[29] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, World Priv. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[30] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk* . . ., *supra* note 21.

[31] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC Consumer Info., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Aug. 25, 2026).

[32] *Id*.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [33]

49. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[34]

50. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was specifically targeted and taken by someone intending to use that information for any number of improper purposes, fraud, and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

51. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs

---

[33] *See* Dixon & Emerson, *supra* note 29.

[34] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. of Systemics, Cybernetics and Informatics 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

**CLASS ALLEGATIONS**

52. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

53. Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information and personal health information was accessed and disclosed in the Data Breach to unauthorized persons, including all who were sent a notice of the Data Breach.

54. Excluded from the Class are Apple American Group LLC and Apple American Group II, LLC, and their affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

55. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

56. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. While Defendants have not reported the total number of Class members affected, Defendants reported to the Massachusetts Attorney General that 16,241 residents were affected and to the Vermont Attorney General that 2,992 residents were affected.[35]

[35] *2026 Data Breach Notification Report*, Mass. Off. of Consumer Affs. & Bus. Regul., https://www.mass.gov/doc/data-breach-report-2026/download (last visited Aug. 25, 2026); *Security Breach Notices*, *supra* note 9.

57. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendants had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. Whether an implied contract existed between Class members and Defendants, providing that Defendants would implement and maintain reasonable security measures to protect and secure Class members' PII/PHI from unauthorized access and disclosure;

e. Whether Defendants breached their duties to protect Plaintiff's and Class members' PII/PHI; and

f. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

58. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

59. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

60. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

61. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

62. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

63. Defendants owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in their possession, custody, or control.

64. Defendants knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems. Defendants knew or should have known of the many data breaches that targeted businesses that collect and store PII/PHI in recent years.

65. Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities to their systems and prevented the Data Breach from occurring.

66. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

67. It was reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

68. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

69. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members

have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**

70. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71. In connection with receiving employment, Plaintiff and all other Class members entered into implied contracts with Defendants.

72. Pursuant to these implied contracts, Plaintiff and Class members provided their labor to Defendants and provided Defendants with their PII/PHI. In exchange, Defendants agreed to, among other things, and Plaintiff and Class members understood that Defendants would: (1) provide employment services to Plaintiff and Class members; (2) collect, maintain, and utilize Plaintiff's and Class members' PII/PHI to, among other things, facilitate their employment; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; (4) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and Defendants' representations; and (5) maintain the confidentiality of Plaintiff's and Class members' PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse.

73. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendants, on the other hand. Had Plaintiff and Class members known that Defendants would not adequately protect their employees' PII/PHI, they would not have agreed to provide Defendants with their PII/PHI or received employment from Defendants.

74. Plaintiff and Class members performed their obligations under the implied contract when they provided Defendants with their PII/PHI and provided their labor to Defendants.

75. Defendants breached their obligations under their implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and Defendants' representations.

76. Defendants' breach of their obligations under their implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

77. Plaintiff and all other Class members were damaged by Defendants' breach of implied contracts because: (i) they provided their labor in exchange for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market;

and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

**<u>COUNT III</u>**
**UNJUST ENRICHMENT**

78. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79. This claim is pleaded in the alternative to the breach of implied contract claim.

80. Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of the value of their labor, and through the provision of their PII/PHI.

81. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate their operations.

82. As a result of Defendants' conduct, Defendants' current and former employees suffered actual damages in an amount equal to the difference in value between payments of labor provided with reasonable data privacy and security practices and procedures, and the value of payments for labor provided Defendants' current and former employees actually received without reasonable data privacy and security practices and procedures.

83. Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members expected when providing labor to Defendants and that were otherwise mandated by federal, state, and local laws and industry standards.

84. Plaintiff and Class members have no adequate remedy at law.

85. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable under law;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: August 25, 2026

Respectfully submitted,

*/s/ Terence R Coates*________
Terence R. Coates (0085579)
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com
dgould@msdlegal.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: 312-621-2000
Fax: 312-641-5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff and the Putative Class*

* *Pro hac vice* forthcoming